UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE:<br><br>BRIAN ELVIN WILDER, JR.,<br><br>　　　　　Debtor. | CHAPTER 7<br><br>Case No. 21-58597-WLH |
| SUMMIT HOSTING LLC,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>BRIAN ELVIN WILDER, JR.,<br><br>　　　　　Defendant. | Adv. Pro. No.:_____ |

**COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF
CERTAIN DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2), (4), AND (6)**

Plaintiff Summit Hosting LLC ("Summit"), by counsel, pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6) and Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure, hereby files this *Complaint to Determine Nondischargeability of Certain Debt Pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6)* (the "Complaint") requesting that the Court determine that certain debt and obligations owed by Debtor/Defendant Brian Elvin Wilder, Jr. ("Wilder" or the "Debtor") to Summit are nondischargeable.  In support of this Complaint, Summit respectfully states as follows:

# I. <u>JURISDICTION</u>

1.      On  November 17, 2021 (the "Petition Date"), Wilder filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (as amended, the "Bankruptcy Code").

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and this matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).   To the extent it is determined that this Court does not have jurisdiction over any part of this matter or that any part of this matter does not constitute a core proceeding, Summit consents to this Court hearing and determining the matter pursuant to 28 U.S.C. § 157(c)(2).

3.      Venue is appropriate in this Court in accordance with 28 U.S.C. § 1409.

4.      Summit is a Georgia limited liability company with its principal office at 6734 Jamestown Drive, Alpharetta, Georgia 30005.

5.      Wilder is a resident of the State of Georgia with an address listed on his voluntary petition at 204 Estuary Trail, Alpharetta, Georgia 30005.

# II. <u>BACKGROUND</u>

## A.     <u>Summit's Relationship with Wilder</u>

6.      Summit is one of the largest providers of cloud-based QuickBooks hosting and Sage hosting in the U.S. and Canada.

7.      Summit hosts mission-critical applications and software on secure dedicated servers that its customers can access remotely on their internet-connected devices from anywhere at a low cost. Overall, Summit's services are designed to make its clients' business operations easier, to save time for its clients, and to minimize its clients' IT and hardware costs

8.      Wilder was a Senior Network Engineer at Summit.

9.      As a Senior Network Engineer at Summit, Wilder was responsible for architecting, maintaining, and securing Summit's IT infrastructure.

10.     As a Senior Network Engineer at Summit, Wilder was also responsible for managing a team of two engineers and supporting Summit's customers' needs and for budgeting IT growth and expenses.

11.     As a condition of Wilder's employment with Summit, Wilder was required to execute an Employee Covenants Agreement (the "ECA").

12.     Wilder signed the ECA on April 16, 2018.  A true and correct copy of the ECA is attached hereto as **Exhibit 1** and is incorporated herein by reference as if fully set forth at length.

13.     The ECA provides that:

Any dispute or claim (including all claims pursuant to common and statutory law) arising out of or relating to: (1) Employees employment; and/or (2) this Agreement shall be resolved exclusively through final and binding arbitration pursuant to the employment dispute resolution rules of JAMS. Any such arbitration proceeding shall be conducted in conformity with the choice of law and jurisdiction venue provisions in this Agreement.

14.     The ECA memorialized Wilder's agreement "to comply with all applicable Company policies adopted during [his] employment," including without limitation those set forth in Summit's employee handbook (the "Handbook"). [ECA § 2.]  A true and correct copy of the Handbook is attached hereto as **Exhibit 2** and is incorporated herein by reference as if fully set forth at length.

15.     Pursuant to the ECA, Wilder further agreed:  (i) that he "has had an opportunity to read the employee handbook and agree[d] to comply with its terms and conditions" [ECA § 2]; and (ii) to use Summit's "computer systems solely for the purpose intended, and further [agreed]

not to permit unauthorized access or navigate into unauthorized areas on the computer systems"
[*Id.* § 4(A)(iv)].

16.     Wilder was subject to the terms and conditions set forth in the Handbook and
other employee policies of Summit.

17.     Wilder acknowledged that he received the Handbook (the "Acknowledgement").
A true and correct copy of the Acknowledgement is attached hereto as **Exhibit 3** and is
incorporated herein by reference as if fully set forth at length.

18.     Pursuant to Summit's Code of Appropriate Conduct as set forth in the Handbook,
Wilder's employment could be terminated immediately for any of the following: breach of trust
or dishonesty, falsifying Summit's records, gross negligence, soliciting or accepting gratuities
from customers or clients, violating Summit Hosting's policies governing computer and internet
use, or damaging or destroying Summit's assets.

19.     Pursuant to the Handbook, Wilder was required to conduct business in accordance
with the letter, spirit, and intent of all relevant laws and to refrain from any illegal, dishonest, or
unethical conduct.

20.     Pursuant to the Handbook, Wilder was required to advise management if he had
any financial or other interest (directly or indirectly) in any entity that was a vendor of Summit.

21.     Pursuant to the Handbook, when making decisions concerning the use or purchase
of materials, equipment, property, services, or any other commodity or item, Wilder was required
to deal only with entities who best serve Summit's requirements as to price, quality, and service,
and to maintain records supporting his purchasing decisions.

**B.    Wilder Fraudulently Enters Contracts on Behalf of Summit without Informing Summit**

22.    eSentire, Inc. ("eSentire") is, among other things, a leading cybersecurity company headquartered in Waterloo, Ontario, Canada.

23.    On February 3, 2018, Summit entered into a Master Security Services Agreement ("MSSA") with eSentire.  A true and correct copy of the MSSA is attached hereto as **Exhibit 4** and is incorporated herein by reference as if fully set forth at length.

24.    The MSSA provided the baseline agreement through which eSentire agreed to provide cyber-security monitoring services to Summit, including without limitation, cyber-security services designed to sniff-out, detect, and report suspicious activity that might indicate an attempt by hostile outside actors to hack into and disable Summit's IT infrastructure.

25.    Summit also purchased various and specific cyber-security services, such as services to protect Summit from ransomware attacks, through eSentire's authorized re-seller Computer Design & Integration, LLC ("CDI"), and agreed to pay CDI directly for these additional eSentire services.

26.    In or about March 2019, Summit ended its direct relationship with CDI and began, instead, to purchase cyber-security services directly through eSentire instead, which services included, without limitation, services to protect Summit from ransomware attacks.

27.    Beginning in March 2019 and for the next several months, Wilder entered into a series of Additional Agreements (as defined herein), beyond the MSSA, with eSentire purportedly for the provision of additional cyber-security services to Summit.

28.    Wilder entered into the Additional Agreements with eSentire without Summit's knowledge or approval, and outside of his authority.

29.     Wilder concealed the Additional Agreements from Summit, including concealing significant additional financial obligations Wilder purported to commit Summit to pay to eSentire for the additional services under the Additional Agreements.

30.     On information and belief, Wilder entered into the Additional Agreements in collusion with eSentire salesperson Kevin Mincemeyer ("Mincemeyer").

31.     On information and belief, Mincemeyer gave financial kick-backs directly to Wilder in exchange for Wilder entering into the Additional Agreements.

32.     Mincemeyer received commission payments from eSentire for the additional "sales" of cyber-security services to Summit under the Additional Agreements.

33.     Without Summit's knowledge or approval, on March 29, 2019, Wilder signed a contract styled "esENDPOINT Addendum" purportedly on behalf Summit, which was signed on behalf of eSentire by eSentire's CFO James Yersh ("Yersh").  A true and correct copy of the esENDPOINT Addendum is attached hereto as **Exhibit 5** and is incorporated herein by reference as if fully set forth at length.

34.     The esENDPOINT Addendum purported to be an addendum to the MSSA between Summit and eSentire.

35.     The esENDPOINT Addendum provided that eSentire would provide 24/7 monitoring and response for outside cyberattacks (including ransomware attacks), provide 24/7 telephone and email support for these services, and be for a term of 36 months, which would automatically renew on the anniversary date for successive 12-month terms, at then-current rates, until terminated with 60-days prior written notice from Summit.

36.     The esENDPOINT Addendum provided that Summit was obligated to pay eSentire $374,850.00 annually for services provided by eSentire thereunder.

37.     Without Summit's knowledge or approval, on March 29, 2019, Wilder signed a contract styled "esLOG+ Addendum" purportedly on behalf of Summit, which was signed on behalf of eSentire by Yersh. A true and correct copy of the esLOG+ Addendum is attached hereto as **Exhibit 6** and is incorporated herein by reference as if fully set forth at length.

38.     The esLOG+ Addendum was purported to be an addendum to the MSSA between Summit and eSentire.

39.     The esLOG+ Addendum provided that eSentire would provide a managed security service that would provide centralized log management, co-managed reporting and compliance, alerting, etc. and that would supplement alleged existing advanced protection against cyber-attacks.

40.     The term of the esLOG+ Addendum was to be for 36 months, which would automatically renew on the anniversary date for successive 12-month terms, at then-current rates, until terminated with 60-days prior written notice from Summit.

41.     The esLOG+ Addendum provided that Summit was obligated to pay eSentire $64,800.00 annually for services provided by eSentire thereunder.

42.     Without Summit's knowledge or approval, on March 29, 2019, Wilder signed a contract styled "Risk Advisory & Managed Prevention Services Addendum" (the "RAMP Addendum") purportedly on behalf of Summit, which was signed on behalf of eSentire by Yersh. A true and correct copy of the RAMP Addendum is attached hereto as **Exhibit 7** and is incorporated herein by reference as if fully set forth at length.

43.    The RAMP Addendum was purported to be an addendum to the MSSA between Summit and eSentire.

44.    The RAMP Addendum provided that eSentire would provide, implement, and support eSentire's cybersecurity program and security consulting services relating to the security of Summit's IT infrastructure.

45.    As part of the services under the RAMP Addendum, eSentire would review, assess, and assist in developing a cybersecurity incident response plan in the event that Summit's IT infrastructure was ever compromised or the subject of a cyberattack, including, without limitation, a ransomware attack.

46.    The term of the RAMP Addendum was to be 36 months, which would automatically renew on the anniversary date for successive 12-month terms, at then-current rates, until terminated with 60-days prior written notice by Summit.

47.    The RAMP Addendum provided that Summit was obligated to pay eSentire $52,556.68 annually for services provided by eSentire thereunder.

48.    Without Summit's knowledge or approval, on May 21, 2019, Wilder signed a contract styled "Managed Endpoint Defense Addendum" (the "MED Addendum") purportedly on behalf Summit, which was signed on behalf of eSentire by Yersh. A true and correct copy of the MED Addendum is attached hereto as **Exhibit 8** and is incorporated herein by reference as if fully set forth at length.

49.    The MED Addendum purported to be an addendum to the MSSA between Summit and eSentire.

50.     Among other things, the MED Addendum provided that eSentire would provide to Summit best practice guidance through Summit's installation of endpoint defense agents, would provide direct assistance in establishing initial monitoring policies for endpoint defense, and would then implement blocking policies for the purpose of hardening Summit's IT infrastructure defenses and blocking cyberattacks including, without limitation, ransomware attacks.

51.     The term of the MED Addendum was to be 36 months, which would automatically renew on the anniversary date for successive 12-month terms, at then-current rates, until terminated with 60-days prior written notice by Summit.

52.     The MED Addendum provided that Summit was obligated to pay eSentire $250,000.00 annually for services provided by eSentire thereunder.

53.     Without Summit's knowledge or approval, on September 16, 2019, Wilder signed a contract styled "esNETWORK Addendum" (collectively with the esENDPOINT Addendum, esLOG+ Addendum, RAMP Addendum, and MED Addendum, the "Additional Agreements") purportedly on behalf Summit, which was signed on behalf of eSentire by Yersh. A true and correct copy of the esNETWORK Addendum is attached hereto as **Exhibit 9** and is incorporated herein by reference as if fully set forth at length.

54.     The esNETWORK Addendum purported to be an addendum to the MSSA between Summit and eSentire.

55.     The esNETWORK Addendum provided that eSentire would provide real-time monitoring of potential cyber threats to Summit's IT infrastructure, including a 24x7 monitoring of Summit's IT infrastructure with the capability of detecting and preventing cyberattacks, data

loss analysis forensic analysis of suspicious cyber activity, prevention of the installation of malware on Summit's IT systems, and other things.

56.    The esNETWORK Addendum also provided for immediate notification and consultation with eSentire in the event of an active cyber-attack.

57.    The term of the esNETWORK Addendum was to be 32 months, which would automatically renew on the anniversary date for successive 12-month terms, at then-current rates, until terminated with 60-days prior written notice by Summit.

58.    The esNETWORK Addendum provided that Summit was obligated to pay eSentire $234,856.25 annually for services provided by eSentire thereunder.

59.    The Additional Agreements were each signed by Wilder, but none was authorized by Summit.

60.    Through the Additional Agreements, Wilder—purportedly on behalf of Summit, but without Summit's knowledge or approval—entered into the Additional Agreements that purported to obligate Summit to pay an additional $977,062 annually for at least the following three (3) years in exchange for eSentire's purported provision of additional IT infrastructure security and cyberattack security services.

61.    On information and belief, Wilder entered into the Additional Agreements because he was receiving financial kick-backs from eSentire—or, at the very least, directly from Mincemeyer himself.

**C.**    **Wilder Conceals the CDI Invoices and Fraudulently Revises the Same**

62.    Meanwhile, CDI continued to invoice Summit for eSentire's services entered into prior to Summit's direct relationship with eSentire for the time period from December 2018 through at least April 2019.

63.    Per Wilder's direction to CDI, without approval or authorization from Summit, CDI sent its invoices (the "CDI Invoices") directly to Wilder and not to Summit's accounts payable personnel.

64.    Wilder did not provide the CDI Invoices to Summit's accounts payable department for payment.

65.    Based on Wilder's failure to remit the CDI Invoices to Summit's accounts payable department, several months' worth of services that CDI provided to Summit went unpaid.

66.    In April 2019, the CDI Invoices totaled approximately $200,000.00.

67.    In or around April 2019, Wilder falsely represented to CDI that Summit had mailed a check to CDI for the CDI invoices. In truth, Summit had not mailed any such check because Wilder concealed the CDI invoices from Summit.

68.    Instead of presenting the CDI Invoices to Summit for payment, Wilder altered the CDI Invoices to make them appear to be for lower amounts (the "Fraudulent CDI Invoices").

69.    Wilder provided the Fraudulent CDI Invoices to Summit's accounts payable department, and Summit paid the Fraudulent CDI Invoices.

11

70.     Wilder led Summit to believe that Summit was current on its payments owed to CDI for past services (i.e., for services CDI provided before Summit entered into a direct relationship with eSentire).

71.     After Summit paid the Fraudulent CDI Invoices, CDI continued to press Wilder for payment from Summit for the amounts due and owing under the CDI invoices, which extended beyond the time Summit had directly contracted with eSentire.

72.     Wilder concealed the CDI Invoices from Summit.

73.     Wilder concealed CDI's entreaties for payment of the CDI Invoices from Summit.

74.     Wilder concealed the CDI Invoices, and CDI's entreaties for payment of the CDI Invoices, from Summit because if Summit knew about the CDI invoices, Summit would have discovered Wilder's separate unauthorized dealings with eSentire—namely, the Additional Agreements.

**D.     Wilder Conceals the eSentire Invoices to Perpetuate His Fraud**

75.     In addition to concealing—and sometimes altering—the CDI Invoices, Wilder also took active measures to conceal invoices issued by eSentire in an effort to keep the Additional Agreements secret from Summit.

76.     Without authorization or approval from Summit, Wilder directed eSentire to send all eSentire invoices related to the Additional Agreements (the "eSentire Invoices") to him and no one else within Summit.

77.     As eSentire began to send the eSentire Invoices for monies owed under the Additional Agreements, Wilder ignored them.

78.     If Wilder would have submitted the eSentire Invoices to Summit's accounts payable department, then Wilder's wrongful and fraudulent conduct in entering into the Additional Agreements would have been exposed.

79.     Within weeks after the first several eSentire Invoices were not timely paid, eSentire's Senior AR Specialist, Sandra Stagg ("Stagg"), contacted Wilder inquiring about non-payment of the eSentire Invoices.

80.     Wilder deflected Stagg and said he would reach out to his administrator at Summit regarding payment of the eSentire Invoices.

81.     Wilder failed to communicate with his administrator, or anyone else, at Summit regarding payment of the eSentire Invoices.

82.     Over the next several months, the unpaid eSentire Invoices piled up, being ignored (of necessity) by Wilder, who never paid them and never passed them on to anyone within Summit who would have had authority to pay them.

83.     Wilder never passed the unpaid eSentire Invoices on to anyone within Summit who would have had authority to pay them because to submit such invoices to Summit for payment would expose the fact that Wilder had entered into the Additional Agreements.

84.     In September 2019, Stagg expressed to Wilder eSentire's concern about the accumulation of unpaid eSentire Invoices, which by then totaled approximately $250,000, informing Wilder that if the unpaid eSentire Invoices were not paid soon, eSentire reserved the right to suspend all cyber-security services it was providing to Summit, including suspending mission critical protections against hackers and ransomware attacks under the MSSA.

85.     When Stagg contacted Wilder in September 2019 regarding the accumulation of unpaid eSentire Invoices, Wilder continued to deflect, making excuses and stalling eSentire.

86.     In October 2019, Stagg again pressed Wilder for payment for the outstanding balance of the eSentire Invoices, which by then totaled approximately $350,000, informing Wilder that eSentire flagged Summit's account for immediate suspension.

87.     When Stagg contacted Wilder in October 2019 regarding the accumulation of unpaid eSentire Invoices, Wilder falsely told Stagg that a check had been cut and was being sent by FedEx to eSentire.

88.     In October 2019 when Wilder told Stagg that a check had been cut and was being sent by FedEx to eSentire, Wilder knew such statement was false.

89.     In October 2019 when Wilder told Stagg that a check had been cut and was being sent by FedEx to eSentire, Wilder hoped that Stagg and eSentire would rely on such statement and continue providing services to Summit.

90.     After Wilder told Stagg that a check had been cut and was being sent by FedEx to eSentire in October 2019, Wilder continued to make various excuses to Stagg about FedEx and the delay of the delivery of the check, which was never cut or sent.

91.     On October 31, 2019, Stagg emailed Wilder and informed him that Summit's account was now almost $500,000 in arrears and that eSentire intended to suspend its provision of all cyber-security services to Summit the following day (i.e. on November 1, 2019).

92.     After the October 31, 2019, email from Stagg to Wilder, Wilder was able to stall eSentire from turning off cyber-security services to Summit for several more weeks through additional representations he told to eSentire.

93.     On November 21, 2019, at 6:44 p.m., eSentire's CFO, Yersh, sent an email to Stanley Kania, President of Summit ("Kania"), in which eSentire complained that Summit was in arrears in its financial obligations to eSentire in the approximate amount of $450,000 "based on deals signed within the last 9 months" (the "First Email").

94.     The First Email contended that eSentire had been dealing with Wilder on the payment of eSentire Invoices, that eSentire had "been told many, many times that [eSentire] were going to be paid," but that the eSentire Invoices still have not been paid, and that Summit had sent eSentire a check, but that Summit then put a stop payment on such check.

95.     Through the First Email, Yersh demanded that Summit pay the entire outstanding balance of the eSentire Invoices by the end of the following day (November 22, 2019) or eSentire would "pursue all actions and methods available" to it, "including shutting service off" to Summit and, consequently, to Summit's customers.

96.     The First Email was the first time that anyone at Summit, other than Wilder, became aware of the unpaid eSentire Invoices.

97.     Kania received the First Email and responded to it within fifteen minutes of receiving it (the "First Response").

98.     In the First Response, Kania protested that Summit's records showed that it was current on all its contractual obligations due and owing to eSentire.

99.     Kania copied Wilder on the First Response.

100.    Upon receipt of the First Response, Wilder knew that his scheme was on the verge of being exposed unless he took drastic measures to further conceal it.

**E.  Wilder Unlawfully Disabled Email and Other Electronic Communications from eSentire and CDI in an Effort to Conceal His Wrongful Conduct From Summit**

101.  No later than November 21, 2019, the day of the First Email and the First response, Wilder created a computerized email rule on Summit's email systems, which he titled "[test 2]" (the "First Unlawful Rule").

102.  The First Unlawful Rule instructed Summit's email servers to block and automatically delete all emails coming from the following email domain name addresses: esentire.com and cdillc.com.

103.  The esentire.com domain related to eSentire, Summit's cyber-security provider, and would account for all emails sent from eSentire.

104.  The cdillc.com domain name address belonged to CDI and would account for all emails sent from CDI.

105.  If the First Unlawful Rule was implemented, all email communications from eSentire and CDI would be blocked, be automatically deleted, and never be received by Summit.

106.  No later than November 22, 2019, Wilder created another computerized email rule on Summit's email systems, which he titled "[test 4]" (the "Second Unlawful Rule").

107.  The Second Unlawful Rule instructed Summit's email servers to block and automatically delete all emails coming from the following email addresses without notifying the recipient of the email, or the sender of the email: Sandra.stagg@esentire.com, James.Yersh@esentire.com, Chris.Braden@estentire.com, Kevin.Mincemeyer@esentire.com, cdillc.com, and esentire.com.

108.  Sandra.stagg@esentire.com is the email address for Stagg.

109.  James.Yersh@esentire.com is the email address for Yersh.

110.    Chris.Braden@estentire.com is the email address for Chris Braden ("Braden"), eSentire's Vice President, Global Channels and Alliances.

111.    Kevin.Mincemeyer@esentire.com is the email address for Mincemeyer.

112.    On November 21, 2019, at approximately 7:14 pm, approximately 30 minutes after the First Email and 15 minutes after the First Response, Wilder turned on the First Unlawful Rule.

113.    On November 22, 2019 at approximately 1:18 p.m., Wilder turned on the Second Unlawful Rule.

114.    No later than the evening of November 21, 2019, Wilder prevented any and all emails coming from either eSentire or CDI from reaching any person within Summit.

115.    Wilder created and turned on the First Unlawful Rule to prevent his scheme from being uncovered any further.

116.    Wilder created and turned on the Second Unlawful Rule to prevent his scheme from being uncovered any further

117.    On information and belief, during the time that the First Unlawful Rule and the Second Unlawful Rule were turned on, Stagg continued to contact Wilder directly inquiring why Summit was not paying the eSentire Invoices.

118.    On information and belief, during the time that the First Unlawful Rule and the Second Unlawful Rule were turned on, CDI was also attempting to contact Summit seeking payment for the CDI Invoices.

**F.**     **Summit Employees Begin to Uncover Wilder's Efforts to Conceal His Wrongful Conduct**

119.    In the normal course of business, Summit's engineers would receive periodic security alerts from eSentire as part of eSentire's on-going monitoring of Summit's cyber-security systems.

120.    In the morning of November 26, 2019, James Martin ("Martin"), a Network Engineer at Summit, and Jared Chapman ("Chapman"), a Senior Network Engineer at Summit, noticed that Summit had not been receiving eSentire's security alerts since November 22, 2019.

121.    On November 26, 2019, Chapman called eSentire regarding the failure to receiver periodic security alerts from eSentire, and eSentire told Chapman that eSentire had been sending regular security alerts (and emails) as usual.

122.    On November 26, 2019, Chapman asked eSentire to test eSentire's email system by sending an email to Chapman's personal email account, which eSentire did, and Chapman received such email from eSentire on his personal account.

123.    Following Chapman's communications with eSentire on November 26, 2019, Chapman then asked Martin to see if anything internal to Summit was keeping Summit from receiving eSentire emails and other electronic communications.

124.    Upon assessing why Summit was not receiving emails from eSentire, Martin discovered the First Unlawful Rule and the Second Unlawful Rule (together, the "Unlawful Rules").

125.    Upon checking a computer audit log at Summit, Martin discovered that Wilder had created and implemented the Unlawful Rules.

126.    Upon discovering the Unlawful Rules, Martin promptly disabled both and brought all of this to Chapman's attention.

127.    After learning about the Unlawful Rules, Chapman confronted Wilder about the existence of the Unlawful Rules.

128.    Upon being confronted by Chapman about the Unlawful Rules, Wilder denied that he had created and implemented the Unlawful Rules, and, to deflect attention from himself, Wilder blamed the issue on Microsoft, telling Chapman that he would contact Microsoft for an explanation.

129.    At approximately 3:21 p.m. on November 26, 2019, the same day that Martin disabled the Unlawful Rules, Wilder reinstated the Unlawful Rules, again blocking all electronic communications from, among others, eSentire to Summit.

130.    On November 26, 2019, Wilder also revoked administrative rights from both Chapman and Martin, effectively locking Chapman and Martin out of Summit's administrative system.

131.    Wilder revoked the administrative rights of Chapman and Martin to prevent Chapman and Martin from further discovering Wilder's efforts to block all eSentire emails.

132.    Wilder revoked the administrative rights of Chapman and Martin to keep Wilder's scheme from being discovered.

133.    Both Chapman and Martin quickly noticed that their administrative rights had been revoked.

134.    Chapman reached out to Wilder and asked why neither he nor Martin had administrative rights.

135.    When confronted by Chapman about the revocation of Chapman's and Martin's administrative rights, Wilder again deflected and blamed the issue on Microsoft, lying to Chapman by telling him that Microsoft was looking into the eSentire issue and must have taken Chapman's and Martin's administrative rights away.

136.    Wilder further lied to Chapman by falsely stating that he (Wilder) was also locked out of Summit's administrative system.

**G.    As a Result of Wilder's Fraud, eSentire Suspends Summit's Cyber-Security Protection for Non-Payment**

137.    The First Email was the last email that Summit received from eSentire before Wilder started blocking and deleting communications through the Unlawful Rules.

138.    On December 4, 2019, as a follow-up to the First Email, Kania sent an email to Yersh (the "Second Response") explaining in detail what Summit believed to be the truth at the time regarding the eSentire Invoices.

139.    The Second Response, among other things, disputed approximately $290,900 in what Summit believed to be over-charges from eSentire, disputed the MED Addendum because Summit believed it was invalid because eSentire had never signed it, and disputed that Summit had put a stop payment on any check to eSentire based on Summit's own internal records, which were confirmed via communications Summit had with its bank.

140.    A central premise for the Second Response was that Summit was not responsible for the eSentire Invoices because Summit never entered into any agreements (i.e., the Additional Agreements) with eSentire related to such invoices.

141.    Wilder was involved in crafting the Second Response, and never indicated that he executed the Additional Agreements.

142.    Summit never received a response back from eSentire to the Second Response.

143.    On information and belief, eSentire did in fact respond, and dispute, the facts in the Second Response, but Summit never received that response because Wilder implemented the Unlawful Rules.

144.    Because Summit never received any of eSentire's communications demanding payment for the eSentire Invoices, the eSentire Invoices continued to go unpaid.

145.    On or about December 10, 2019, eSentire suspended Summit's account and stopped providing cyber-security protection to Summit.

146.    Summit was unaware that eSentire ceased providing cyber-security protection to Summit because Wilder continued to block and delete eSentire's communications through the Unlawful Rules.

**H.    Wilder Caused the Ransomware Cyber-Attack**

147.    In his capacity as Senior Network Engineer for Summit, Wilder would receive from time to time requests from remote users to be let into, and log onto, Summit's IT systems.

148.    On January 18, 2020, at approximately 4:05 p.m., a ransomware cyber-attacker (the "Cyber-Attacker"), posing as a Summit employee working remotely, tried to gain access to Summit's IT infrastructure.

149.    Summit's authentication logs show that Wilder let the Cyber-Attacker into Summit's IT infrastructure.

150.    Wilder's actions in permitting the Cyber-Attacker into Summit's IT infrastructure violated Summit's internal IT protocols, which required him to verify the identity of any remote user as an authorized user before permitting access to Summit's IT infrastructure.

151.    Wilder's actions in permitting the Cyber-Attacker access to Summit's IT infrastructure was at least reckless and/or grossly negligent.

152.    Wilder quickly realized that he permitted an unauthorized person (or persons) access to Summit's IT infrastructure.

153.    After realizing that he had permitted access to Summit's IT infrastructure to the Cyber-Attacker, Wilder promptly attempted to cover his tracks by attempting to manipulate Summit's authentication logs to make it appear that a former Summit employee had permitted the Cyber-Attacker with access to Summit's IT systems.

154.    On January 18, 2020, at approximately 5:00 p.m. (shortly after Wilder let the Cyber-Attacker in to Summit's IT systems), the Cyber-Attacker locked Summit out of its own IT infrastructure, thus also locking out Summit's customers from accessing their hosted applications and data.

155.    The Cyber-Attacker demanded $150,000.00 in ransom to unlock Summit's IT infrastructure system.

156.    On January 21, 2020, Patterson called Yersh, asking Yersh to turn eSentire's service back on, but Yersh flatly refused, stating that Summit needed to pay its outstanding balance before eSentire would turn back on its cyber-security services.

157.    On January 29, 2020, Summit paid the Cyber-Attacker the ransom it demanded. (Summit was thereafter compensated for this amount by its insurance carrier, less Summit's retention amount).

158.    From January 18 through January 29, 2020, Summit was in crisis-mode as it dealt with the fall-out from the ransomware attack, investigating how the Cyber-Attacker gained access to Summit's systems and questioning employees, including Wilder.

159.    When questioned about the Cyber-Attacker, Wilder blamed Martin for letting the Cyber-Attacker in to Summit's IT infrastructure.

**I.    Summit Discovers Wilder's Fraudulent Conduct and Terminates Wilder's Employment.**

160.    During its investigation of the ransomware attack after January 18, 2020, Summit discovered that it had not been receiving emails or communications from eSentire in the days leading up to the ransomware attack.

161.    Kania and Summit's Chief Operating Officer, Warren Patterson ("Patterson"), questioned Wilder about why Summit had not been receiving emails or communications from eSentire in the days leading up to the ransomware attack.

162.    In responding to the questions of Kania and Patterson, Wilder forwarded an eSentire email to Kania and Patterson from Wilder's personal email account (the "Second Email").

163.    Kania and Patterson asked Wilder why the Second Email was sent to Wilder's personal email account instead of his Summit work email account, and Wilder said that Summit was having problems receiving eSentire emails, and that eSentire would not talk with Wilder or with Patterson.

164.    When Kania and Patterson asked Wilder why eSentire would not talk with Wilder or with Patterson, Wilder failed to give a reasonable explanation.

165.    At that point, Patterson began to suspect the truth—that Wilder was somehow responsible for Summit not receiving eSentire emails or other notifications—and contacted Chapman and Martin for further information.

166.    After Patterson spoke with Chapman and Martin and examined Summit's computer logs, Patterson became convinced that Wilder had:  (i) entered into separate contracts with eSentire (i.e., the Additional Agreements); (ii) concealed the Additional Agreements from Summit; (iii) created rules to block and delete all communications from eSentire to Summit to further conceal Wilder's scheme; (iv) locked out both Chapman and Martin from administrative privileges within Summit because they were getting close to discovering Wilder's scheme; and (v) had let the Cyber-Attacker into Summit's IT infrastructure system.

167.    In the morning of January 27, 2020, Kania and Patterson confronted Wilder with their discovery of Wilder's fraudulent conduct.

168.    When confronted about his fraudulent conduct, Wilder, at first, denied any involvement, stating that Microsoft had blocked eSentire emails and communications.

169.    After Wilder denied any wrongful actions, Kania and Patterson showed Wilder the computer logs evidencing that Wilder had, in fact, created the Unlawful Rules, and had turned them on and off at various times in the past several months, which coincided with Summit's receipt (or non-receipt) of eSentire electronic communications.

170.    Once Summit's computer logs were shown to Wilder, Wilder confessed, admitting that he had:  (i) entered into the Additional Agreements without Summit's authorization; (ii) concealed the Additional Agreements from Summit; and (iii) implemented the Unlawful Rules in an effort to conceal his wrongdoing from Summit.

171.    When Kania and Patterson asked Wilder why he had defrauded Summit, Wilder refused to give any explanation.

172.    At the conclusion of Kania and Patterson's meeting with Wilder, Summit terminated Wilder's employment and Wilder was escorted from Summit's premises.

**J.    Summit Attempts to Address Wilder's Wrongful Conduct**

173.    Later that same day, Patterson emailed Yersh (the "Third Email"), outlining Wilder's wrongful conduct and telling Yersh that Wilder had created and implemented the Unlawful Rules to block and delete all communications coming from eSentire and CDI.

174.    After the Third Email, Patterson told Yersh that Summit suspected that Mincemeyer was involved in Wilder's scheme, and that Mincemeyer was likely paying Wilder kick-backs in exchange for Wilder entering into the Additional Agreements.

175.    On information and belief, eSentire demanded that Mincemeyer pay back his commission for the Additional Agreements shortly after Patterson told Yersh about the Wilder/Mincemeyer scheme.

176.    On information and belief, Mincemeyer resigned from eSentire shortly thereafter rather than repay his commission for the Additional Agreements.

177.    As a result of Wilder's wrongful conduct, Summit has incurred damages in excess of $400,000.00, which includes lost revenue due to customer cancellations, losses as the result of refunds or other price concessions paid to keep existing customers after the ransomware attack, monies paid to CDI to resolve Wilder's concealment of the CDI Invoices, monies paid to eSentire to resolve Wilder's concealment of the eSentire Invoices, and harm to Summit's reputation.

178.    Additionally, as a result of Wilder's wrongful conduct, including, without limitation, Wilder's reckless and/or grossly negligent conduct in connection with admitting the Cyber-Attacker, Summit has incurred damage to its reputation and goodwill with its customers and potential customers.

179.    In May 2020, with Wilder's blockages of emails from CDI disabled and email traffic flowing freely, CDI contacted Summit and demanded payment of approximately $190,000.00 for the unpaid CDI Invoices.

180.    Upon examination of the CDI Invoices, and comparing them to the CDI invoices Summit received from Wilder (i.e., the Fraudulent CDI invoices), Summit and CDI discovered that Wilder had altered various invoices to make them appear to be for lower amounts (which Summit had previously paid), and had failed to present other invoices altogether.

181.    Although CDI's unpaid invoices showed that Summit owed CDI approximately $190,000.00, Summit was able to settle its account with CDI by paying CDI $60,000.00.

182.    In June 2020, eSentire, through a collection agency, contacted Summit and demanded payment for approximately $643,000 worth of unpaid invoices.

183.    Summit disputed those amounts and argued that the Additional Agreements were invalid and unenforceable due to Wilder's and Mincemeyer's wrongful conduct as alleged herein, among other reasons.

184.    Ultimately, Summit settled the dispute with eSentire by paying eSentire the sum of $245,264.83.

**K.**    **Summit Commences Legal Proceedings against Wilder**

**i.**    **Wilder's Violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030(a)(4)**

185.    Summit's computers and computer systems are used in and/or affect interstate or foreign commerce or communications.

186.    Wilder intentionally accessed a Summit computer and Summit's computer systems without authorization and/or beyond his authorization.

187.    Wilder recklessly caused damage to Summit's protected computers, impairing the integrity of availability of data, a program, a system, or information.

188.    As a result of Wilder's conduct, Summit suffered loss, including, but not limited to, the cost of responding to an offense, conducting a damage assessment, and/or restoring data, a program, a system, or information to its condition prior to the offense.

189.    Additionally, Summit suffered lost revenue, incurred costs, and/or incurred other consequential damages because of an interruption of service due to Wilder's reckless and unwarranted conduct.

190.    As a result of Wilder's wrongful conduct, Summit suffered damages in an amount greater than $5,000 in value.

**ii.**    **Wilder's Violation of the Stored Communications Act, 18 U.S.C. § 2701(a)**

191.    Wilder intentionally accessed, without authorization, a facility through which an electronic communication service is provided.

192.    Wilder intentionally exceeded his authorization to access a facility through which an electronic communication service is provided.

193.    Wilder obtained, altered, and/or prevented authorized access to a wire or electronic communication while it was in electronic storage.

194.    As a result of Wilder's wrongful conduct as alleged herein, Summit suffered damages.

### iii.    Wilder's Breach of the ECA

195.    Wilder's employment with Summit was governed, at least in part, by the terms set forth in ECA.

196.    The ECA, together with the corresponding Handbook, was a valid contract supported by adequate consideration.

197.    Summit has performed all of its obligations under the ECA.

198.    Wilder breached one or more of his obligations under the ECA.

199.    As a direct result of Wilder's breach, Summit incurred damages.


### iv.    Wilder's Gross Negligence

200.    Wilder owed Summit a duty to act with reasonable care.

201.    By Wilder's conduct, Wilder breached his duty of care.

202.    Wilder's conduct was, at a minimum, reckless and/or grossly negligent.

203.    As a direct result of Wilder's breach, Summit incurred damages.

### v.    Wilder's Fraud

204.    Wilder made false representations to Summit.

205.    Wilder knew his representations were false and that his conduct was wrongful.

206.    Wilder intended to induce Summit to act or refrain from acting in reliance on Wilder's false representations.

207.    Summit did not know about the falsity of Wilder's false representations.

208.    Summit justifiably relied on Wilder's false representations.

209.    As a direct result of Wilder's false representations, Summit incurred damages.

**vi.    Arbitration**

210.    On June 15, 2020, Summit filed its *Demand for Arbitration and Complaint for Binding Arbitration* (the "Demand") with JAMS Arbitration, commencing Case No. 144000 6837 (the "Arbitration Case") against Wilder. A true and correct copy of the Demand is attached hereto as **Exhibit 10** and is incorporated herein by reference as if fully set forth at length.

211.    Pursuant to the Demand, Summit alleged that Wilder was liable to Summit for: (i) violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030(a)(4); (ii) violation of the Stored Communications Act, 18 U.S.C. § 2701(a); (iii) breach of the ECA; (iv) gross negligence; and (v) fraud.

212.    On July 13, 2020, F. Carlton King, Jr. (the "Arbitrator") was appointed as the neutral to oversee the Arbitration Case.

213.    After considering the pleadings, evidence, arguments, and submissions, the Arbitrator issued the *Final Award* on June 4, 2021 (the "Arbitration Award"), which found Wilder liable for: (i) violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030(a)(4); (ii) violation of the Stored Communication Act, 18 U.S.C. § 2701(a); (iii) breach of the ECA; (iv) gross negligence; and (v) fraud. A true and correct copy of the Arbitration Award is attached hereto as **Exhibit 11** and is incorporated herein by reference as if fully set forth at length.

214.    Pursuant to the Arbitration Award, the Arbitrator ruled against Wilder and in favor of Summit for compensatory damages in the amount of $447,373.67, for punitive damages in the amount of $450,000.00, and for attorneys' fees and costs in the amount of $90,169.18 (collectively, the "Damages").  In total, the Damages amounted to $987,542.85.

**L.       Post-Award Proceedings**

215.    Following the entry of the Arbitration Award, Wilder failed to pay the Damages to Summit.

216.     Accordingly, on June 29, 2021, Summit filed its *Application and Motion for Confirmation of Arbitration Award* (the "Application") in the Superior Court of Forsyth County, Georgia (the "State Court"), commencing Case No. 21CV-1036-2, to confirm the Arbitration Award.

217.    On September 13, 2021, the State Court entered that certain *Order Confirming Arbitration Award and Final Judgment* (the "Final Judgment"), confirming the Arbitration Award against Wilder and in favor of Summit for compensatory damages in the amount of $447,373.67, for punitive damages in the amount of $450,000.00, and for attorneys' fees and costs in the amount of $90,169.18.  A true and correct copy of the Final Judgment is attached hereto as **Exhibit 12** and is incorporated herein by reference as if fully set forth at length.

218.    Pursuant to Georgia law, from September 13, 2021, through the Petition Date, the post-judgment interest rate was 6.25% per annum.   From the date of the Final Judgment through the Petition Date, post-judgment interest accrued in the amount of Ten Thousand Nine Hundred Ninety-One and 49/100 Dollars ($10,991.49) (the "Pre-Bankruptcy Interest").

**M.     Wilder's Bankruptcy**

219.    Pursuant to Schedule D of Wilder's Petition [ECF No. 1] (the "Petition"), Wilder listed Summit as an undersecured creditor with an unsecured claim that arose from a lawsuit in the amount of $995,633.00.  [*Petition* 22.]

220.    The Damages and the Pre-Bankruptcy Interest (together, the "Indebtedness") are due and owing from Wilder to Summit.

221.    Wilder has failed to pay Summit pursuant to the Final Judgment.

222.    Wilder is liable for the Indebtedness pursuant to the Final Judgment.

223.    Wilder has failed to pay the Indebtedness.

<u>**COUNT I**</u>
**NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)(A)**

224.    Summit restates and incorporates the allegations set forth in Paragraphs one (1) through two hundred twenty-three (223) above, as if fully set forth at length.

225.    Section 523(a)(2)(A) of the Bankruptcy Code provides, in relevant part, that an individual debtor may not obtain a discharge from any debt —

(2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

226.    Wilder made multiple false representations (collectively, the "False Representations"), including, but not limited to:

(a) that he would comply with the ECA;

(b) that he would comply with the Handbook;

(c) that he would use Summit's computer systems solely for the purpose intended;

(d) that he would not permit unauthorized access or navigate into unauthorized areas on Summit's computer systems;

(e) that he would conduct business in accordance with law, and refrain from any illegal, dishonest, or unethical conduct;

(f) that he had authority to enter into the Additional Agreements;

(g) that the Fraudulent CDI Invoices were true and correct copies of invoices due and owing to CDI;

(h) that Summit was in receipt of all invoices from eSentire for amounts allegedly due and owing to eSentire;

(i) that he did not know about the Unlawful Rules;

(j) that Microsoft was the reason email communications from eSentire were not being received by Summit;

(k) that Microsoft was the reason Chapman and Martin had their administrative rights revoked;

(l) that Microsoft was assessing the reason why email communications from eSentire were not being received by Summit;

(m) that he had his administrative rights in Summit's IT infrastructure revoked; and

(n) that Martin was responsible for allowing the Cyber-Attacker with access to Summit's IT infrastructure.

227. Wilder committed multiple acts with the intention of deceiving and/or hiding his misdeeds from Summit (collectively, the "Wrongful Acts," and together with the False Representations, the "Wrongful Conduct"), including, but not limited to:

(a) Executing the Additional Agreements;

(b) Hiding the CDI Invoices from Summit;

32

(c)  Creating the Fraudulent CDI Invoices;

(d)  Hiding the eSentire Invoices from Summit;

(e)  Hiding communications from CDI with Summit;

(f)  Hiding communications from eSentire from Summit;

(g)  Creating the Unlawful Rules;

(h)  Lying to Chapment and Martin about the Unlawful Rules;

(i)  Locking Chapman and Martin out of administrative access to Summit's IT infrastructure; and

(j)  Lying about how the Cyber-attacker gained access to Summit's IT infrastructure.

228.    When Wilder made the False Representations, Wilder knew they were false.

229.    When Wilder committed the Wrongful Acts, he knew such acts were wrong.

230.    When Wilder committed the Wrongful Acts, he did so with the intention of deceiving Summit.

231.    When Wilder made the False Representations, he intended for Summit to rely upon them.

232.    Summit did reasonably rely on the False Representations.

233.    When Summit relied on the False Representations, Summit had no reason to believe such representations were false.

234.    When Wilder made the False Representations, Wilder induced Summit to continue paying Wilder his salary.

235.    When Wilder made the False Representations, Wilder induced eSentire to provide services to Summit that Summit would eventually pay for.

236.    When Wilder made the False Representations, Wilder induced Summit to pay the ransom to the Cyber-Attacker.

237.    When Wilder made the False Representations, Wilder induced Mincemeyer to pay Wilder kick-backs.

238.    Wilder's Wrongful Acts complemented and supported the False Representations.

239.    Summit would not have paid Wilder, among others, the amounts it did if Summit had been aware of the false nature of the False Representations.

240.    Summit would not have paid Wilder, among others, the amounts it did if Summit had been aware of Wrongful Acts.

241.    As a result of Wilder's Wrongful Conduct, Summit has suffered damages in an amount not less than the Indebtedness.

242.    The damages in an amount not less than the Indebtedness are the proximate result of Wilder's Wrongful Conduct.

243.    The liabilities and obligations of Wilder to Summit under the Arbitration Award and the Final Judgment are nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

244.    Summit had no knowledge of the aforementioned fraud, false representations, and/or false pretenses until after Summit had already issued payment to Wilder, among others, and incurred substantial damages.

245.    Summit's damages as a result of Wilder's actions include, but are not limited to, the nonpayment of the Indebtedness, including the Final Judgment and post-judgment interest.

WHEREFORE, Summit respectfully requests that the Court (i) declare all liabilities and obligations of Wilder due and owing to Summit pursuant to the Final Judgment

nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code in the amount of at least the Indebtedness or otherwise determined at trial, plus interest, costs of collection, and expenses, including attorneys' fees, incurred after the entry of the Final Judgment; and (ii) grant such other and further relief that is just and proper.

<u>**COUNT II**</u>
**NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(4)**

246.    Summit restates and incorporates the allegations set forth in Paragraphs one (1) through two hundred forty-five (245) above, as if fully set forth at length.

247.    Section 523(a)(4) of the Bankruptcy Code provides, in relevant part, that an individual debtor may not obtain a discharge from any debt —

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

248.    Summit trusted Wilder to act in good faith on behalf of Summit.

249.    Summit trusted Wilder, giving Wilder access to Summit's IT infrastructure systems.

250.    Summit trusted Wilder, giving him authority to grant parties access to Summit's IT infrastructure systems.

251.    Wilder abused Summit's trust.

252.    In executing the Additional Agreements, Wilder represented that he was executing the same on behalf of Summit.

253.    In requesting that CDI and eSentire send him all invoices, Wilder was representing that he was the recipient of such invoices on behalf of Summit.

254.    In communicating with CDI and eSentire regarding outstanding invoices, Wilder was representing that he was representing the interests of Summit.

255.    In making the False Representations, Wilder was representing that he was putting the interests of Summit ahead of his own.

256.    In making the False Representations, Wilder failed to meet his fiduciary duty to Summit.

257.    In committing the Wrongful Acts, Wilder failed to meet his fiduciary duty to Summit.

258.    As an employee of Summit, Wilder had a duty to communicate with other employees and representatives of Summit in good faith.

259.    As an employee of Summit, Wilder had a duty to communicate with vendors of Summit, such as CDI and eSentire, in good faith.

260.    In executing the Additional Agreements, Wilder held himself out as a fiduciary of Summit.

261.    In requesting that CDI and eSentire send him all invoices, Wilder held himself out as a fiduciary of Summit.

262.    In communicating with CDI and eSentire, Wilder held himself out as a fiduciary of Summit.

263.    Wilder's Wrongful Conduct was either intentional or constitutes extreme recklessness.

264.    Wilder's Wrongful Conduct is contrary to Wilder's obligations, both explicit and implicit, owed to Summit.

265.    Wilder's Wrongful Conduct constitutes fraud and/or defalcation in a fiduciary capacity under § 523(a)(4) of the Bankruptcy Code.

266.    Wilder had knowledge of and personally engaged in the foregoing fraud and/or defalcation.

267.    Wilder's failure to perform his obligations and act in good faith for the benefit of Summit was done intentionally, with extreme recklessness, or with conscious disregard that such failure to act violated Wilder's fiduciary duties.

268.    Wilder breached his fiduciary duty to Summit by committing the Wrongful Conduct.

269.    Wilder was trusted with Summit's data and IT information.

270.    Wilder behaved as if Summit's data and IT information was his own.

271.    Wilder misappropriated Summit's data and IT information.

272.    The obligations of Wilder to Summit are nondischargeable under § 523(a)(4) of the Bankruptcy Code.

273.    Summit has been damaged from Wilder's breach of his fiduciary duty to Summit.

274.    Summit's damages as a result of Wilder's actions include, but are not limited to, the nonpayment of the Indebtedness, including the Final Judgment and post-judgment interest.

WHEREFORE, Summit respectfully requests that the Court (i) declare all obligations of Wilder due and owing to Summit nondischargeable under § 523(a)(4) of the Bankruptcy Code in the amount of at least the Indebtedness or otherwise determined at trial, plus interest, costs of collection, and expenses, including attorneys' fees, incurred after the entry of the Final Judgment; and (ii) grant such other and further relief that is just and proper.

<u>**COUNT III**</u>
**NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(6)**

275.    Summit restates and incorporates the allegations set forth in Paragraphs one (1) through two hundred seventy-four (274) above, as if fully set forth at length.

276.    Section 523(a)(6) of the Bankruptcy Code provides, in relevant part, that an individual debtor may not obtain a discharge from any debt—

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

277.    Wilder willfully and maliciously caused injury to Summit by committing the Wrongful Conduct.

278.    Wilder willfully and maliciously committed the Wrongful Conduct with the intent to deceive Summit into continuing to employ Wilder, continuing to pay Wilder, punishing other Summit employees, and disputing amounts owed to vendors, like CDI and eSentire, all for Wilder's personal benefit.

279.    Wilder's Wrongful Conduct was intended to deceive Summit.

280.    Wilder's Wrongful Conduct was made so that Wilder would receive capital from Summit, amongst others.

281.    Wilder's Wrongful Conduct was wrongful.

282.    Wilder knew, or was substantially certain, that if Wilder's Wrongful Conduct was never discovered by Summit, then Wilder would continue to benefit from such Wrongful Conduct.

283.    Summit's injuries as a result of Wilder's actions and/or inactions include, but are not limited to the nonpayment of the Indebtedness, including the Final Judgment and post-judgment interest.

284.    Wilder's Wrongful Conduct is the proximate causes of injury to Summit.

285.    Wilder has no just cause or excuse for committing the Wrongful Conduct.

286.    Wilder knew, or was substantially certain, that Summit would be harmed or damaged by his actions.

287.    Wilder intended to harm Summit by taking the actions that he took.

288.    The obligations of Wilder to Summit are nondischargeable under § 523(a)(6) of the Bankruptcy Code.

289.    Summit had no knowledge of the aforementioned willful and malicious acts/conduct until after Summit had already been damaged and harmed by Wilder.

WHEREFORE, Summit respectfully requests that the Court (i) declare all obligations of Wilder due and owing to Summit nondischargeable under § 523(a)(6) of the Bankruptcy Code in the amount of at least the Indebtedness or otherwise determined at trial, plus interest, costs of collection, and expenses, including attorneys' fees, incurred after the entry of the Final Judgment; and (ii) grant such other and further relief that is just and proper.

## **RESERVATION OF RIGHTS**

Summit reserves its right to amend this Complaint as new facts become available as discovery and/or this action progresses.

Respectfully submitted this 30th day of March, 2022.

*/s/ Jeffrey C. Morgan*
Jeffrey C. Morgan
Georgia Bar No. 522667
BARNES & THORNBURG LLP
3475 Piedmont Road NE, Suite 1700
Atlanta, GA 30309
T: 404-264-4015
F: 404-264-4033
jeff.morgan@btlaw.com

Christopher J. Daniels
Georgia Bar No. 113177
BARNES & THORNBURG LLP
3475 Piedmont Road N.E., Suite 1700
Atlanta Georgia 30305
T: 404-264-4085
F: 404-265-4033
cdaniels@btlaw.com

*Attorneys for Plaintiff Summit LLC*
